Good morning, Your Honors. Marilyn Bednarski on behalf of Mr. Andrew Sahanaja. Her wasn't close. Oh, well. Very close. Very close. Two issues were raised on appeal. The sentencing issue, I believe, is agreed upon by both counsel that there should be a remand under Ameline. One fact that's not in the briefing that's retired, which is a further fact, I think, that supports the remand. So I'll move to the search issue. This is a case where we challenged search. Our position is that statutory search power here, the search was purported to be conducted under Section 482 of Title 19, and our position is that that statutory search power is constitutionally limited. This was not a border search nor conducted close to a border, was not a functional equivalent of a border. Let me ask you this in terms of geographical proximity. If the mail had been intercepted as international mail before going to the local post office and had been opened in the post office where it was opened, would that have been a border search? Yes. The question is not where that is physically. The question is the route that it took to get there. It is, and it's a question of the difference in your example is that customs is involved from the start. Okay. So it's not a question that this is far removed from the border. The question is how did it get to that point before? What was the route that it took in order to get there? Yes. Just to put a point on that, it's not really a physical thing. I mean, the mail could have come into Kansas City if the customs people looked at it in Kansas City. If that was the point of entry, it would have been consistent with 482. Right. There are cases where the customs facility is combined with the local mail facility. That was not the situation here. Here, and the court concluded that while there was no direct evidence, certainly the inference that the court found this to be so is that it came in through an international mail facility separate from the local post office. And that was the place where customs had people in place to be inspectors. This is a case where a criminal law enforcement search was conducted at the request of a postal inspector. Customs only got involved in this case. In fact, customs wasn't involved at all. There was no suspicion on the part of customs. There was no surveillance on the part of customs. Customs was only involved because a postal inspector called them up and said, pick up this package and search it. So essentially, the search was at the behest of a law enforcement officer. Well, customs is law enforcement too, right? I mean, they can look for evidence of crime all by themselves. They can. Going back to Judge Fletcher's question, if they had intercepted it immediately and had a law enforcement purpose, that would have been okay. Yes. And that's what happened in the Tagazade case, which is where a customs inspector identified a Federal Express parcel and was suspicious about it and opened it and found there were drugs and then sent it on as a controlled delivery. Our case is different because until the postal inspector called customs up on the 18th, customs wasn't involved nor suspicious at all. So this was a case where- The argument basically is they had probable cause and they should have just held onto it and gotten a warrant. They should have requested a warrant. Exactly. Because this was a typical law enforcement investigation. They had identified suspicious circumstances. They had detained and held custody of a package. They had identified witnesses and interviewed witnesses, the carrier who took the package out. This was a package that had come to the Duarte Post Office some nine days before the search. Its entry was at the International Port, but it arrived at the local post office on about November 10th. It had been out for delivery in a carrier's vehicle and back. There were numerous efforts made by the client and his girlfriend to obtain the package. And it was at that point that suspicion arose because of the odors and the efforts made by the client to get the package, which appeared to the postal people to be suspicious. So they then call customs and ask them to do what they cannot do. The postal inspector could not have conducted a custom search. And so it was really an end run around the Fourth Amendment. This was a case where they should have applied to a judge for an objective determination of whether there were facts there to support the issuance of a warrant and entry. I was a little surprised as I was working up this case that there are so few cases giving us this. I mean, I found none directly on point. I wondered about that, too. And I think it's because they don't do it. I think it's because they either go for a warrant or perhaps what Judge Graber suggested is that in the normal and routine course of events, suspicious packages are identified in search by customs and customs is involved and surveils the package. But in this situation where it's essentially a I think it's a rare circumstance. But if the package had been exactly in the condition that it was when customs searched it, when it came in, in other words, if it had been leaking and there was an odor emanating from it, they would have had a reasonable cause to search it. Yes. So just to, I'm trying to formulate this, if it had sat on a shelf in the International Mail Facility for nine days and during that time it started to smell and leak, customs could have searched it. Yes. So it's the fact that it left the physical possession of customs and that the deterioration of the package and the other suspicious circumstances happened when it was not in the custody of customs that creates a heightened requirement? Well, I think that customs clearly can perform routine searches. And I think even at that international port of entry, they could search it without suspicion at all. Right. But what happened here is it became more and more attenuated from the border and wasn't even under the guidance or surveillance of customs. But it never left the custody of the federal government, if you use the broad rubric of the federal government. It was either in the custody of customs or the post office. It was never delivered to the defendant. And I guess what I'm trying to understand is if it would have been OK for the package to sit in customs for nine days and then they could have searched it at that point, why does it matter that in that nine day period certain things happened that made it even more suspicious? Well, I think it's a question of attenuation. For instance, if you carry that thought one step farther, could customs come into your house and search a package that merely had an international label? What if that package had been. Entry into a home has a whole other set of. Sure. Can they can they take it, you know, if it's sitting on the curb by your house might be a more. All right. Or let's say that you received it and you send it on to someone else, but it still has the international label on it. Can customs just continue to search it days and days and days and places and places and places after? It seems to me that one thing that distinguishes our case. From those cases is that customs involvement wasn't continuous from the start and it wasn't under their surveillance. But I guess Judge Fogel's question is, why does it have to be customs if it's someone else in the government? Because customs authority is limited and other agencies of the government are are also bound by the Fourth Amendment, but they don't have a customs exception. And that power to search is limited for a reason and it goes back hundreds of years. And and we extend it out and continue to water down that limitation. Then it seems to me the danger is there that any agency could hand something back to customs merely because it came at some point from an international source. I'm struggling with this, as I think we all are, because we don't have case law that's fair. What the post office people are are suspecting once this has gone on, the package is leaking, the carrier is nauseous, the person who puts it on the shelf in the back apparently even throws up afterwards. We've got two people coming in without being able to produce identity that they are Fox. And so I mean, they got all these circumstances. Which leads them to believe that there's a crime. And one of the crimes, maybe the primary crimes, is a customs crime. Are you saying that they can't send it back to customs when they suspect a customs crime? I'm saying they can't hand it off for a routine custom search. It seems to me. What does the word routine have to do with it? Well, it doesn't seem routine. Is that necessary to your argument? I guess what I mean by routine is a custom search that is done and that is distinct from a law enforcement search originated by another agency. They can't recreate the situation that there was at the border or at the extended border. Seems to me they can they can ask customs to be involved, but they have to follow the Constitution. They have to get a warrant at that point and apply to a magistrate for a warrant, not simply call up customs to get an agent that has the so-called statutory authority by virtue of his job. Even though it's never been delivered. Right, because at that point and clearly in this case on these specific facts, it was a criminal law enforcement investigation. It was a postal inspector investigation and they can't do an end run around the Fourth Amendment simply because at some point earlier on, had it been the case, customs could have searched a package under their authority. Thank you, counsel. I think I do. I want to save my 36 seconds. Well, you're minus 36, but we'll give you. Oh, I'm sorry. I don't see a minus. Well, it's red instead of green or yellow. But it's difficult for anyone who's colorblind or in the midst of argument. Good morning, and may I please the court. Beyonce Kim for the United States. Putting aside for a moment the issue of standing and addressing some of the concerns and questions that the panel has raised. There are a few facts with respect to the search under 482 in this case that are disputed. It's undisputed first that 482 gives the customs agents authority to search packages wherever found. It's undisputed that it was a customs. What does it say wherever found? It says that in Section 482, Your Honor. We have a copy of that on the briefing. I didn't bring my code book down. Search any trunk or envelope wherever found in which he may have reasonable cause to suspect there is merchandise which was imported contrary to law. I read it, but I did not remember that term. Okay. I'm with you. It's undisputed that that's what the statute says, that it was a customs agent who performed the search. That is also in the past tense that says has been imported in violation of. Was imported contrary to law. That's correct, Your Honor. It's also undisputed that that the statute requires reasonable suspicion and the government's position is that reasonable suspicion is necessary both under the statute and because of the distance from the border under the Fourth Amendment. And it's undisputed that there was reasonable suspicion in this case given the leakage of the package, the mislabeling of the package, the suspicious circumstances involving the attempts to obtain the package. So what we're left with, Your Honors, is the question whether the fact that other law enforcement agencies other than customs were involved in this search and in this case somehow dilutes or takes away the clear statutory authority of the customs. I have two questions. The first one is, does it make any difference that the package could have been picked up by an addressee if the addressee had come in with proper identification? In other words, it was actually at the end of the road and available for pickup. Does that make any difference? I don't think it does, Your Honor. The important point, as stated in the case law, is that the package remained unchanged while before the customs search was conducted in this case. In other words, it was attempted to be delivered on November 10, 2003. After that attempt failed, it simply sat unopened, unaltered in a back room in a post office. So we don't have to decide the case of what happens if it actually had been delivered because it wasn't. That's correct, Your Honor. I'm not sure this is relevant to our analysis or to your argument, but I'm not sure it's been unchanged. They say only the government's done anything to it, but it's unclear the point at which it began to leak. Would it make any difference if, as it came through the international checkpoint the first time through, that there was no leakage? It begins to leak. It makes people nauseous only after it arrives at the endpoint post office. Does that make a difference? I don't think it does, Your Honor. There are very few cases where, especially involving an international package, where there's someone who's actually able to testify about the precise condition of the package at the exact time that it passes over the international border. So all of the cases are, in a sense, retrospective in that they involve a package that has already been delivered or that has already arrived in the United States and passed the border. And then the law enforcement agents look at the package and see whether there's something suspicious about it or not. There aren't any cases where, involving international packages, where someone can testify about the condition of the package as it passes the border, if that answers your question. And the important point, I think, indicated in the case law, and particularly in cases involving contraband in vehicles, is was the contraband still in the vehicle at the time it crossed the border if the first time that the vehicle was searched was some distance from the border? In this case, there's no question, I don't think, that the contraband, the GBL and GHB, was in the package both at the time that the search was conducted and at the time that the package crossed the border. I take it that you would agree, though, that if this were domestic mail that had never passed through the realm of customs, a warrant would have been required? That's correct, Your Honor. The customs authority only applies to packages that have crossed the border. And the Postal Service doesn't have separate authority or any other law enforcement and would have no separate authority. So we rise or fall on the customs issue. That's correct, Your Honor. Another important point with respect to this issue is that this wasn't a case where a postal inspector has a case and then simply calls a friend or a colleague who works at customs to have that person open up the package and then the case remains with the Postal Inspection Service. This is a case where the postal inspector transfers the case to the customs agency because it involves a case of possible improper importation of substances. What do you mean transfers the case? What I mean is, I understand it's not sent a package back. Does he do anything more than that? Or you don't mean there's some form of case file that's been opened or do you? Your Honor, the defense lawyer made a statement that a call or some kind of communication was made, we have this package, come and open it up. That's not what happened in this case. Rather, the case was transferred and there wasn't any split. Do you mean anything more than that the package was transferred? What do you mean when you say the case was transferred? What I mean, Your Honor, and this is in the record, is that the customs agent by the time of the suppression hearing was the case agent. He was the principal law enforcement agent and it was the customs agency that had the case at that point. In other words, this isn't a case where the customs is brought in for a very specific purpose to search the package and then their involvement ends. That's not what happened in this case. If it had happened, maybe there would be a little bit more traction to the notion that this is an attempt to somehow circumvent the warrant requirement that the Postal Inspection Service is calling in customs simply so that they don't have to bother getting a warrant. That's not what happens. And when the when the customs inspector is called, he's not called for the explicit purpose of opening up the package. He's called because the postal inspection has this suspicious package and they simply want to transfer both the package and the case to customs to investigate. That's the investigation of the package. Correct. We've got a problem. This is an international parcel. Please take this off our hands. Yeah, that's right. And there's no explicit request made, you know, please just open up this package and then I'll retain this case. That's not that's not those aren't the facts here. Just to make sure I now understand the point, but I think I want to make sure I understand the limitations on the point. There's no formal paperwork that's going back and forth that says this was our case. It is now your case. No, Your Honor. That's not in the record, at least. I would submit further, Your Honors, that this that under the Alfonso case and even under the Soto Soto case, which I think the defense relies on heavily, there's language in both of those cases strongly stating that the involvement of other law enforcement agencies besides customs doesn't somehow take away the power of customs to do what they are authorized to do under 482. In fact, the Soto case goes a little bit farther and suggests that if the FBI agent in Soto Soto had actually been coordinating with customs in order to search the package in that case, that the search might have been OK, even though it's an FBI agent who is searching it. In this case, we don't have a situation even close to that because it's undisputed that a customs agent is the one who searched the package. I would submit that creating this kind of doctrine where if if a case or if a package somehow passed through other law enforcement agencies before it got to customs would be incredibly difficult to administer. And although this isn't in the record, I would suggest that it's not infrequent at all that there are many people besides the customs agency who might handle a package after it is after it has crossed the border. With respect to standing by your honors, the government's position is that under Nordling, there are two factors that are most important, denial of ownership and relinquishment of the property. In this case, both of those factors strongly argue against standing because the defendant consistently denied that the package was his. The package was, in fact, addressed to someone besides the defendant, a man named Harry Fox, whom the defendant represented was simply a friend of his or an associate. And third, the defendant actually asked that the package be sent back to the sender. Objectively viewed, all of these facts demonstrate that there was no privacy interest at that point. And that is an issue that the government submits the court can review the denial of a somewhat different argument than a straightforward abandonment argument. I would submit, Your Honor, that it's it's it's a little bit stronger than the typical abandonment case was never. Your argument in part is it was never his to abandon in the first place. That's right. Because the denial of ownership, a typical abandonment case is in the course of the Garcia case, for example, where there's a fanny pack and the right away. And the defendant in that case actually just runs away. So we don't have any kind of issue with respect to who owns the fanny pack. There's just the running away and the physical abandonment. Here we have both the denial of ownership and then also, although it's not a physical relinquishment, it's a verbal request. The district court seemed to think that what he was really trying to do is exercise dominion over the package through these various denials. And I guess that was when an underpinned Judge Baird's conclusion that there was standing. That's right, Judge Vogel. I think Judge Baird focused more precisely on what she said, is that all of these attempts to send the package back were attempts really to protect the privacy of the package, to make sure that no one in law enforcement saw its contents. That may very well be, but viewed objectively, what we have is denial of ownership and a request to send the package back. And after that, there's really nothing much left with respect to the defendant's privacy interest. Although the government's got a bit of a twist here because, number one, you're trying to say he never had ownership or any expectation of privacy because it wasn't a directive to him. But as soon as they figure out what's in it, they deliver it to him and grab him for an attempted receipt of contraband goods. It's true. You're wanting it both ways on this argument. Well, I would deny that charge. I think. Get the presumption for the moment. I think, Your Honor, that the important point with respect to the actual controlled delivery is that the package has already been opened up at that point. So whether the fact that. I understand that. But what they're kind of sticking with is you want this package. We're going to give it to you now. And as soon as you open it up or as soon as you accept it, we're going to arrest you for possession of the package. Your Honor, he didn't have to accept the delivery of the package, but he did. I've made my point and you've made yours. Yeah. And I think we understand your position that you've exceeded your time by quite a bit. So. Thank you, Your Honor. Thank you. I will give you a minute for rebuttal since the government took a little extra. We'll give you a little extra. Thank you. On the warrant issue, all the cases that the appellee relies on were all cases where customs originated the investigation or had continuing surveillance or continuing oversight over the packages. On the standing issue, the court, the district court appropriately applied a circumstances test, looking at words, actions, and objective circumstances. Denial of ownership is only one of those factors. There were numerous other factors that all supported standing. Mr. Sahania clearly wanted the package. The postal people testified to that effect at the hearing. He had made that clear to all the people. He had sent his girlfriend. He had called to inquire. He had sent a notice in. He had made efforts over days. He only made the statement, return it to sender. And this is as the district court found, and it was supported in the record, after the postal people made it clear they weren't going to give it to him if he didn't have identification. That's why it was reasonable for the court to draw the inference that the statement he made was to maintain privacy over the package, to keep it from being opened. They had given him the option, open it in our presence without ID, which he declined. And then they would only return it to the sender if he couldn't produce identification. Thank you, counsel. Thank you very much. Again, the case is submitted and we appreciate excellent arguments by both. Very helpful.
judges: Graber, W. Fletcher, Fogel